IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA JACKSON, | ) | Case No. 1:17-cv-1085 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |
| | ) | |

## I.    Introduction

Plaintiff, Joshua Jackson, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income Benefits under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ's decision was not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and the matter be REMANDED for further proceedings.

## II.    Procedural History

Jackson applied for disability insurance benefits on May 23, 2014.  (Tr. 14, 191-198)  He alleged a disability onset date of February 1, 2011.[1]  (Tr. 191)  His application was denied

---

[1] The ALJ noted that Jackson had applied for SSI previously, in August 2011, alleging a disability onset date of August 17, 2011.  The ALJ concluded that the prior evaluation of disability between August 17, 2011 and the February 5, 2013 date of the prior decision could not be revisited on *res judicata* grounds.  Thus, the instant decision deals only with Jackson's claim to have been disabled between February 1, 2011 and August 16, 2011 and from February 6, 2013 through the date of the decision on May 17, 2016.

initially on August 12, 2014 (Tr. 110-123) and after reconsideration on December 11, 2014.  (Tr. 124)  Jackson requested an administrative hearing (Tr.144), and Administrative Law Judge ("ALJ") Joseph Vallowe heard the case on April 4, 2016.  (Tr. 31-81)  The ALJ found that Jackson was not disabled in a May 17, 2016 decision.  (Tr. 11-26)  Jackson requested review of the hearing decision on May 23, 2016.  (Tr. 9-10)  On April 27, 2017, the Appeals Council denied review, rendering the ALJ's conclusion the final decision of the Commissioner.  (Tr. 1-6)  On May 23, 2017, Jackson filed this action challenging the Commissioner's final decision.  ECF Doc. 1.

III.    **Evidence**

   A.    **Personal, Educational and Vocational Evidence**

Jacskon was born on November 14, 1987 and was 28 years old when the ALJ's decision issued.  (Tr. 191)  He has a high school education.  (Tr. 39)  Jackson is married and lives with his wife and 4 year-old stepson.  (Tr. 38)  He worked in the past as a school custodian and groundskeeper.  (Tr. 41)

   B.    **Medical Evidence**

Jackson was diagnosed with multiple sclerosis ("MS") in 2011.  (Tr. 327)  An MRI study of Jackson's brain on June 6, 2011 showed multiple foci of hyperintensity in the white matter, consistent with the clinical diagnosis of MS.  (Tr. 327)  A CT scan of the cervical spine showed plaque formation on the cervical spinal cord, consistent with MS and also showed a small disc-osteophyte complex at C6-7 which contacted, but did not compress the spinal cord.  (Tr. 327-328)  The burden of the MS was noted as mild.  (Tr. 329)

Jackson was treated at MetroHealth Medical Center on November 18, 2012 after being hit by a car.  (Tr. 268)  Jackson suffered a fracture of the right medial malleolus.  (Tr. 271)  He also complained of low back pain and right hand numbness but these problems were not caused or

2

worsened by the accident.  (Tr. 268)  A CT scan of Jackson's lumbar spine showed a chronic pars defect at L5 with a grade I spondylolisthesis of L5 on S1, with an L5-S1 disc herniation causing moderate-to-severe narrowing of the neural foramina on the left.  (Tr. 262)  An MRI showed that Jackson had congenital spina bifida at the L5-S1 level.  (Tr. 262)  The scan also showed a nodule in the right upper lobe of the lung, together with emphysematous changes, and hepatic steatosis (fatty liver disease.) (Tr. 256)  A physician attempted to reduce Jackson's ankle fracture in the emergency room, but was unable to do so.  Jackson's ankle was splinted and he was discharged with instructions to follow up for possible surgical correction of the fracture.  He was also told to avoid bearing weight on his right leg.  (Tr. 271)

On May 20, 2014, Jackson started treating with Dr. Robert Fox, M.D., a neurologist at the Cleveland Clinic.  Dr. Fox noted that Jackson had been diagnosed with MS in 2011 and was taking Avonex for that condition.  Dr. Fox's note stated: "This appears to be his first relapse since 2011." Jackson was experiencing numbness and paresthesia on the right side of his body, in his foot, leg, chest and arm – to just below the shoulder.  Dr. Fox also noted weakness.  (Tr. 322, 410)  Jackson reported that his memory was a bit off and admitted to depression as well as anxiety.  Dr. Fox noted that there was no suggestion of cognitive or memory disturbance and Jackson's affect was flat.  (Tr. 323, 411)  On examination, Dr. Fox found decreased vibratory sensation at the toes bilaterally and slowed fine finger movements on the right.  (Tr. 324, 412)  Motor function strength was 5/5 on the left and 4/5 on the right; fine finger movement was slowed on the right side; deep tendon reflexes were normal throughout; gait was normal; hopping and standing on a single foot was intact, and tandem walking was intact.  (Tr. 323-324, 411-412)  Dr. Fox prescribed medication and ordered a brain/cervical MRI.  (Tr. 324, 413)  The June 6, 2014 MRI was consistent with MS. (Tr. 328, 416)

Dr. Fox ordered a series of three Depo-Medrol intravenous infusions beginning on May 21, 2014 and on the following two days.  (Tr. 375, 379-382)

Dr. Fox also referred Jackson to a psychologist for evaluation of his depression.  On June 4, 2014, Psychologist Matthew Sacco, Ph.D., performed a psychological evaluation of Jackson. (Tr. 331)  Jackson reported using marijuana daily for headaches.  (Tr. 332)  Dr. Sacco found that Jackson's cognitive functioning was normal.  (Tr. 333)  Mental status examination showed that Jackson was alert, fully oriented, adequately groomed and had normal speech.  His thoughts were logical, coherent and goal-directed.  Insight and judgment were good and cognition was grossly intact.  (Tr. 333-334, 422)  Dr. Sacco diagnosed a "substance-induced mood disorder" likely due in part to methylprednisolone treatment.  He also noted that several other diagnoses needed to be ruled out including a mood disorder due to the MS itself, as well as possible diagnoses of major depression, grief reaction, and PTSD.  Dr. Sacco assigned a Global Assessment of Functioning ("GAF") score of 55.  He prescribed a trial of Wellbutrin and recommended proper nutrition, exercise, sleep hygiene and that Jackson engage in free exercise, especially yoga and water aerobics.  (Tr. 334-335, 422)

Margaret Henning, CNP, showed Jackson a video entitled "Taking Control of Your MS" on June 9, 2014 at the Mellen Center.  Jackson told Ms. Henning that he had been having daily migraine headaches for the past year.  He also reported right hand numbness.  (Tr. 337)  Jackson was alert, cooperative, oriented, and in no emotional distress.  Shoulder shrug strength and muscle strength in both lower and upper extremities was normal except for slight weakness in the left hand. Sensory perception was intact and gait was normal.  (Tr. 339, 427)  Jackson was referred to the headache clinic.  (Tr. 342)

Jackson met with Dr. Sacco on June 17, 2014 complaining of migraine headaches which began when Jackson started taking Avonex.  (Tr. 351)  Dr. Sacco recommended a consultation

with neurology team for migraines, sleep study, and antidepressant medication.  (Tr. 351)  Dr. Sacco observed that Jackson had a depressed mood with a flat affect; he was passive and withdrawn, with psychomotor slowing.  (Tr. 351)  Dr. Sacco diagnosed mood disorder depressive disorder, NOS, and continued to note the need to rule out various other possible diagnoses.  (Tr. 352)  He recommended that Jackson continue psychoeducation and cognitive behavioral therapy to cope with depression.  (Tr. 352)

Jackson followed up with Dr. Sacco on July 31, 2014.  Jackson reported that he had stopped taking his Wellbutrin after he was prescribed an antibiotic a few weeks earlier for bronchitis.  (Tr. 445)  Jackson reported that his mood had improved and his stress levels were the same.  Jackson had gotten married that week but stated that it was "not a stressor."  (Tr. 445)  Examination showed that Jackson was pleasant and interactive; had flat affect; normal orientation, intact and linear associations, no hallucinations or delusions; and fair insight and judgment.  (Tr. 446)  Dr. Sacco diagnosed mood disorder depressive disorder, NOS, MS, problems with primary support group and social environment, and assigned a GAF of 55.  (Tr. 446)  Jackson missed a subsequent appointment with Dr. Sacco.  (Tr. 449)

Jackson met with Daneen Abston, CNP, in the neurology department of the Cleveland Clinic on September 30, 2014.  (Tr. 451)  Ms. Abston noted that Jackson had stopped Avonex injections claiming that they gave him "flu-like" symptoms.  He wanted to switch to oral medications.  Jackson complained of right knee pain from walking.  (Tr. 451)  He also reported needing help with zippers and buttons due to the numbness in his right hand.  Ms. Abston observed that Jackson was slightly unsteady with tandem walking.  She also noted that he did not appear to be depressed and had a normal affect.  (Tr. 452)  She recommended that he start the oral medication, Tecfidera.  Dr. Fox also discussed this medication with him.  (Tr. 453)

On December 29, 2014, Dr. Martene Binstock at Healthspan performed an annual physical exam. (Tr. 471)  Dr. Binstock noted that Jackson had not been to see her for a year but was treating at the Cleveland Clinic.  He had been off of his MS medication for about three months.  He had decreased sensation on his right side and continued to have headaches.  He continued to have lower back pain but was not taking any medication for it.  (Tr. 477)  Physical therapy had not helped.  He continued to smoke electronic cigarettes and marijuana.  (Tr. 478)  Jackson was instructed to follow-up with neurology as needed for MS.  (Tr. 480)

On January 25, 2015, Dr. Josephine Fernando, an orthopedic physician, examined Jackson's lower back.  Jackson reported that he had experienced back pain for six years.  (Tr. 495)  Dr. Fernando observed normal range of motion and normal gait.  There was no tenderness.  Jackson had equal strength and was negative for straight leg raise testing.  Dr. Fernando recommended physical therapy, weight loss, a home exercise program and that Jackson stop using cannabis.  (Tr. 496)  An x-ray of the lumbar spine showed spina bifida at L5-S1 with disc space narrowing at that level and a mild anterolisthesis.  (Tr. 544)

Jackson followed-up with Karla Madalin, M.D., on February 24, 2015 for his MS.  Dr. Madalin noted that Jackson had not been taking Tecfidera as prescribed by Dr. Fox because it was not authorized by his insurance.  Dr. Madalin noted that Jackson had difficulty grasping objects with his right upper extremity.  He was having difficulty walking due to his right lower extremity "giving out." (Tr. 512) Jackson complained that his whole body was sore.  (Tr. 516)  Examination showed that recent and remote memory were intact, attention span, concentration and speech were normal.  Muscle bulk and tone were normal but there was "give way" weakness over the entire right upper and lower extremity. (Tr. 517) Strength was intact on the left.  Dr. Madalin prescribed medication for fatigue and a recommended authorization for a different MS medication, Gilenya. (Tr. 518)

6

On June 29, 2015, Jackson went to the emergency department for a flare-up of his MS.  He complained of numbness and tingling in the right leg from the hip down.  He had not taken his MS medications for six months and requested IV steroids.  Neurological examination showed that Jackson was alert and oriented with normal speech, no focal findings or movement disorder, normal mental status, intact cranial nerves, but he had numbness/tingling in the right lower extremity.  The physician prescribed another course of steroid infusions.  (Tr. 534)

Jackson met with Dr. Madalin again on July 14, 2015 and reported that he had lost his insurance for two months.  He had not started Gilenya yet.  He reported little improvement of his recent MS flare up but slight improvement of strength and sensation in his right upper and lower extremities.  Jackson reported some recent memory problems and that he had had L'Hermitte's sign since his MS diagnosis.  Jackson continued to complain of fatigue but had not started taking the medication Dr. Madalin prescribed at his last appointment.  (Tr. 535)  Jackson had decreased toe and heel walking and muscle bulk and tone were normal.  He had mild muscle weakness in his right extremities.  Sensory testing showed a decreased sensation to touch in both the right arm and leg.  Jackson did not use an assistive device but was using a TENS unit to alleviate some of his lower back pain.  Range of motion in his back was intact with moderate lumbosacral tenderness. (Tr. 538)  Dr. Madalin prescribed Amantadine for fatigue and resubmitted the paperwork for Gilenya to Jackson's insurer.  (Tr. 540)  She ordered a cervical MRI, which showed a slight increase in abnormal signal in the cervical cord when compared to images from November 2013. (Tr. 548)  An MRI of the brain taken on August 18, 2015 showed a slight increase in foci, particularly in the right parietal lobe, when compared with the November 2013 study.  (Tr. 546)

On February 19, 2016, Jackson met with Ronald Adams, M.D.[2]  (Tr. 555) Dr. Adams prescribed Naprosyn for Jackson's back pain.  (Tr. 561)

_____

[2] These records and all subsequent records were submitted to the Appeals Council, but were not submitted

7

On March 8, 2016, Jackson saw Dr. Madalin again.  (Tr. 566)  She noted that his MS was stable on Gilenya.  (Tr. 582, 585)  Amantadine was helping with his fatigue.  (Tr. 585)  He was still experiencing daily headaches in the right hemicranial. (Tr. 582)  She noted no change in the weakness in his right arm and leg and no new MS symptoms.  (Tr. 583)

### C.    Opinion Evidence

#### 1.    Treating Physician – Karla Madalin – July 2015

Following his appointment on July 14, 2015, Dr. Madalin completed a medical source statement.  (Tr. 466-467)  Dr. Madalin opined that Jackson would not be able to lift more than ten pounds due to weakness in his right upper and lower extremities caused by MS.  She opined that he could stand and walk for less than one hour a day because of right upper and lower extremity weakness and also due to back pain.  However, she felt that he was unlimited in his ability to sit.  (Tr. 466)  She wrote that he would be unable to perform any postural or manipulative activities.  (Tr. 466-467)  Dr. Madalin felt that Jackson would need to alternate positions between sitting, standing and walking at will.  She further thought that pain would likely interfere with Jackson's concentration and would cause absenteeism.  She also felt that environmental restrictions such as heights, moving machinery and temperature extremes would affect Jackson's impairments.  (Tr. 467)

Dr. Madalin also completed a medical source statement regarding Jackson's mental capacity.  She limited most of his work related mental functions to occasionally.  She opined that he could constantly follow work rules, frequently relate to coworkers and supervisors, and frequently socialize, behave in an emotionally stable manner and relate predictably in social situations.  (Tr. 468-469)

---

to the ALJ.  Plaintiff argues that these records are related to a period of time prior to the issuance of the ALJ's decision. ECF Doc. 11, Page ID# 654, n.3.

### 2.     State Agency Consulting Psychologist – Dr. Michael Firmin, Ph.D., – January 2012

Jackson met with Michael Firmin, Ph.D., for a psychological evaluation on January 5, 2012.  Jackson reported that he was unable to work because he didn't have any feeling in his right hand and had back problems.  Jackson reported mild depression but he had never discussed it with a doctor.  Jackson reported a diagnosis of MS in October 2011.  (Tr. 244)

Jackson was able to drive and drove himself to the appointment.  (Tr. 244, 247)  He was able to shop but rarely did so.  He spoke to family members every day, to friends and neighbors fairly often, and went to family or friends' homes or invited them over.  For recreation, Jackson reported playing with children, playing games or cards, listening to music, and watching TV. Jackson was able to clean the house including vacuuming, cooking and washing dishes.  (Tr. 247)

Dr. Firmin diagnosed depressive disorder, not otherwise specified; back, hand, and MS problems; unemployment; and assigned a GAF score of 65.  (Tr. 248)  Dr. Firmin stated that Jackson was capable of understanding, remembering and carrying out simple instructions; was capable of maintaining concentration, persistence, and pace to perform simple and multi-step tasks; was capable of responding appropriately to supervisors and coworkers in a work setting; and possessed satisfactory capacity to handle stress in the work setting.  (Tr. 249-250)

### 3.     State Agency Reviewing Physicians

Gary Hinzman, M.D., reviewed Jackson's records on August 2, 2014.  Dr. Hinzman opined that Jackson had the functional capacity to perform light work, with an ability to frequently climb ramps and stairs but never ropes, ladders, or scaffolds.  Hinzman limited Jackson to frequent crouching and crawling, occasional stooping, and frequent handling, fingering and feeling with his right hand.  (Tr. 106)

Rannie Amiri, M.D., reviewed Jackson's records on December 3, 2014.  Dr. Amiri agreed with the opinions expressed by Dr. Hinzman, except he added a restriction for occasional

kneeling.  He also assigned to Jackson's left hand the limitations Dr. Hinzman assigned to Jackson's right hand, but this was likely a clerical error.  (Tr. 118-120)

### D.      Relevant Testimonial Evidence

Jackson testified at the hearing.  (Tr. 37-71)  He was thirty years old and lived in a house with his wife and her four year old son.  (Tr. 37-38)  He graduated from high school in 2006.  (Tr. 40)  Jackson had a driver's license and drove his stepson and nephew to and from school every day.  (Tr. 38-39)  He went to church every Sunday.  (Tr. 60)  He also attended monthly parent association meetings.  (Tr. 61)

From 2007 to 2008, Jackson worked full-time as a custodian and a groundskeeper for Warrensville Board of Education.  (Tr. 41-42)  He was on his feet most of the day and was frequently required to lift more than 25 pounds.  (Tr. 43)  He was fired for using his phone.  (Tr. 42)

Jackson was no longer working because he had numbness on the right side of his body due to MS.  (Tr. 43-45)  He had trouble using his right, dominant hand and would often drop things.  (Tr. 66)  He had shooting pains that were getting worse.  (Tr. 51-52)  He also had migraine headaches every day.  (Tr. 53)

Jackson got poor sleep due to lower back problems.  (Tr. 55-56)  He used a TENS unit before going to bed to relax his muscles.  (Tr. 71)  Jackson tired during the day and would sometimes lie down for 30 minutes to an hour.  (Tr. 64)

Jackson took medication for MS but felt that it was not helping.  (Tr. 45)  He was also taking Wellbutrin for depression and medication for fatigue.  (Tr. 46)  Jackson was not seeing a psychiatrist at the time of his hearing, but felt that he should be.  (Tr. 51)  Jackson stopped taking medications for some time due to a gap in his insurance coverage.  (Tr. 48)  Jackson smoked marijuana three times a day.  He testified that it helped with his pain and fatigue.  (Tr. 54)

Jackson felt that he could walk five or ten minutes and lift 15-20 pounds.  (Tr. 56)  He was able to dress himself without assistance and to attend to his personal hygiene.  (Tr. 59)  He was able to cook and wash dishes.  (Tr. 59)  Jackson was able to use the computer and play video games.  (Tr. 61-62)  His mother and wife did the grocery shopping.  (Tr. 60)

Daniel Simone, a vocational expert ("VE"), also testified at the hearing.  (Tr. 72-80)  Mr. Simone found that Jackson's past work was a commercial cleaner.  (Tr. 73)  Mr. Simone answered a series of hypothetical questions which plaintiff has not challenged on appeal.  Mr. Simone also testified that a worker who was off more than 15% of the workday, or who would miss work in excess of one day per month, would not be able to maintain employment.  (Tr. 79-80)

## IV.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3]….

42 U.S.C. § 423(d)(2)(A).

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## V.    The ALJ's Decision

The  ALJ  issued  a  decision  on  May  17,  2016  setting  forth  the  following  paraphrased findings:

1. Jackson had not engaged in substantial gainful activity since May 23, 2014, the application date.  (Tr. 17)

2. Jackson  had  the  following  severe  impairments:  obesity,  multiple  sclerosis, spine disorder, osteoarthritis and affective disorder.  (Tr. 17)

3. Jackson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 17)

4. Jackson had the residual functional capacity to perform light work except he could push and pull as much as he could lift and carry; he could frequently use hand controls on the left; he could frequently handle and finger with the left upper extremity, but could only occasionally handle, finger and feel with the right upper extremity; he could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; he could frequently balance, crouch, and crawl, but could only occasionally kneel and stoop; he could never be exposed to unprotected heights or moving mechanical parts; he could never operate a motor vehicle; he needed to avoid concentrated exposure to extreme heat; he was limited to simple, routine tasks and low stress work, meaning no arbitration, confrontation, supervisory responsibility or responsibility for the safety of others.  (Tr. 18-19)

5. Jackson was not capable of performing past relevant work.  (Tr. 24)

6. Jackson was born on November 14, 1987 and was 26 years old, a younger individual age 18-49, on the date he applied for benefits.  (Tr. 24)

7. Jackson had at least a high school education and was able to communicate in English.  (Tr. 25)

8. Transferability of job skills was not an issue because the claimant's past relevant work was unskilled.  (Tr. 25)

9. There were jobs that existed in significant numbers in the national economy that Jackson could perform.  (Tr. 25)

Based on the foregoing, the ALJ determined that Jackson had not been under a disability since May 23, 2014, the day his application was filed.  (Tr. 26)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner may not be reversed just because the record contains

substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3

(6th Cir. 2001) (citin*g Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also

support another conclusion, the decision of the Administrative Law Judge must stand if the

evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within

which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545

(*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal

standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v.*

*Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d

742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [when] the reasons given by the trier of fact do not

14

build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

### B.     Treating Physician Rule[4]

Jackson argues that the ALJ erred in assigning little weight to his treating neurologist, Dr. Madalin. He further contends that the ALJ failed to state good reasons for the weight he assigned. Finally, Jackson argues that the ALJ erred in assigning greater weight to the state agency reviewing physicians than he did to Jackson's treating physician.

The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

---

[4] 20 CFR §§ 416.927 applies to Jackson's claim because it was filed before March 27, 2017.

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938.  ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

16

from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

Regarding Dr. Madalin's opinion of Jackson's physical capacity, the ALJ stated:

As for the medical source statement by Karla Madalin, MD, I give her opinion little weight (Ex. B6F). Although Dr. Madalin is the claimant's treating neurologist, she began treating the claimant as recent as February 25, 2015. While the July 2015 examination demonstrated decreased heel and toe walking on the right along with 4.8/5 weakness in the right upper extremity, this was following a June 29, 2015 flare up. These findings are not consistent with the overall medical record of evidence demonstrating normal muscle strength, a normal gait and normal reflexes. Therefore these findings do not support Dr. Madalin's opinion that the claimant could perform a less than sedentary job, with the inability to reach, push, pull, perform fine manipulation, or engage in postural activities. Moreover, her statement that the claimant would need to sit/stand at will and experiences severe pain that interferes with his ability to concentrate, stay on task, and be present is not supported by the objective evidence of record. Not only did the claimant report his symptoms were improving despite failing to start his medication, but he did not allege a worsening in his ability to perform activities of daily living. Therefore, I give Dr. Madalin's opinion little weight.

(Tr. 24-25)

The ALJ's reasons for assigning little weight to the opinion of Dr. Madalin were that she had only begun treating him in February 2015 and that her findings were not consistent with the overall record. After making these findings, the ALJ was then required to point to "evidence in the case record, *** sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The ALJ failed to do this.

The ALJ was incorrect that Dr. Madalin first saw Jackson in February 2015. Plaintiff points to records from Dr. Madalin showing that she also saw him in October 2013. (Tr. 503-504) Jackson concedes that he treated elsewhere, at the Mellon Center of the Cleveland Clinic,

between October 2013 and February 2015.  Nonetheless, Dr. Madalin has a longitudinal history treating Jackson and the ALJ was incorrect to devalue her opinions for this reason.

And the ALJ does not point to any specific evidence in the record to support his finding that Dr. Madalin's opinions were inconsistent with the record.  (Tr. 23)  The ALJ states *generally* that the overall medical record demonstrates normal muscle strength, a normal gait and normal reflexes, (Tr. 23) but he does not actually point to any records showing these findings.  And the ALJ failed to explain how the records documenting Jackson's upper and lower extremity weaknesses didn't undermine this general characterization of the record.

Similarly, the ALJ failed to cite any record evidence for his finding that there was no objective evidence supporting Dr. Madalin's opinion that Jackson would need to sit/stand at will and that he experiences severe pain that interferes with his concentration.  However, the ALJ did not cite any part of the record showing that Jackson could sit or stand for lengthy periods without needing to change position.  Nor did he cite any support for his finding that Jackson stated his symptoms improved "despite failing to start his medications."  (Tr. 23)

The Commissioner's points to several portions of the record that would arguably have supported the ALJ's findings.  However, this *post hoc* rationale cannot be substituted for the reasons actually offered by the ALJ.  *See Johnson v. Sec'y of Health &Human Services,* 794 F.2d 1106, 1113 (6th Cir. 1986); *Gardner v. Colvin,* 2015 U.S. Dist. LEXIS 91197, *16 (N.D. Ohio 2015).

Moreover, there were portions of the records showing less than normal muscle strength, normal gait and normal reflexes.  For example, in May 2014, Dr. Fox noted right-sided weakness and slowed fine finger movement on the right and decreased vibratory sensation in the toes.  (Tr. 322-324)  Nurse Abston noted unsteady tandem walking in September 2014.  (Tr. 452)  Dr. Binstock noted decreased sensation on the right side in December 2014.  (Tr. 473)  Jackson

concedes that "not every visit demonstrates the same findings."  However, he contends that the ALJ erred in finding that other portions of the record did not corroborate Dr. Madalin's opinions. ECF Doc. 1, Page ID# 660.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly when a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  In this case, the ALJ failed to provide an adequate explanation for his handling of Dr. Madalin's opinions.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion is harmless error.  These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the

claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. App'x at 551.

Here, the ALJ incorrectly stated that Dr. Madalin had only recently started treating Jackson.  The ALJ also failed to point to any specific records supporting his finding that Dr. Madalin's opinions were inconsistent with the record as a whole.  Thus, the court cannot determine whether the ALJ fully considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6) including whether the medical evidence in the record as a whole supported Dr. Madalin's opinions.  For these reasons, I find that the ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Madalin's opinion regarding Jackson's limitations was not harmless error.  Even if good reasons existed to reject the treating physician's opinion, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review. The Court should reject the ALJ's determination.

Jackson also argues that the ALJ erred in assigning more weight to the opinions of the state agency reviewing physicians, who did not review a complete record.  In *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009), the Sixth Circuit held that in some circumstances opinions from state agency medical consultants may be entitled to greater weight than the opinions of treating sources, such as when the consultant's opinion is based on a review of a complete case record providing more detailed and comprehensive information than was available to the treating source.  Here, the opposite is true, because the state-agency reviewing physicians were not able to review a complete set of records.  Jackson points to records submitted after the state agency physicians rendered their opinions.  These records include imaging of his brain and cervical spine showing worsening of his MS.  Jackson argues that the ALJ should have at least

considered this fact before assigning greater weight to the state agency reviewing physicians. ECF Doc. 11, Page ID# 662.

Although it may have been appropriate in this case for the ALJ to assign greater weight to the opinions of the state agency physicians than to the opinion of Dr. Madalin, I agree with Jackson that the ALJ failed to provide good reasons for assigning little weight to Dr. Madalin. Thus, the ALJ's decision to assign partial weight to the opinions of the state agency physicians, particularly when they did not review a complete record, is also questionable.  If the court remands this case, as I have recommended, I also recommend that the ALJ be directed to consider whether the state agency physicians reviewed a complete record before assigning weight to their opinions regarding Jackson's residual functional capacity.

## VII.    Recommendation

Because the Commissioner's decision was not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and that the matter be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

Dated: April 24, 2018

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).